NATIONAL COMMODITY CORPORATION, a Delaware corporation, Plaintiff, v. AMERICAN FRUIT GROWERS, INC., a Delaware corporation, Defendant.

(*December* 12, 1949.)

PEARSON J., sitting.

*Stewart Lynch, Robert P. Barnett,* and *Phillip Levy* (of Washington, D. C.) for plaintiff.

*Daniel F. Wolcott* (of the firm of Southerland, Berl and Potter) and *Harry S. Dunmire* (of Pittsburgh, Pennsylvania) for defendant.

Superior Court for New Castle County, No. 974, Civil Action, 1948.

PEARION, Judge.

· In October 1947, the plaintiff as buyer and the defendant as seller entered into a series of contracts for the sale of a total of seven million pounds of dry, edible peas for future delivery. 3-480,000 pounds were delivered by defendant to plaintiff under certain of the contracts. 3,520,000 pounds were not delivered. In this action, plaintiff asserts that defendant breached its contracts (relating to 3,520,000 pounds) by failing to deliver this quantity of peas to plaintiff; and further asserts that defendant made certain overcharges, which plaintiff paid, with respect to the peas that were delivered. Plaintiff claims damages in the amount of $43,328.33, with interest. Defendant denies any breach of contract on its part and denies that it made any overcharges. By counterclaim, defendant asserts that plaintiff breached its contracts by failing to take delivery of and to pay for the 3,520,000 pounds pursuant to the terms of the contracts, and claims damages in the amount of $8538.71, with interest.

In the fall of 1947, defendant had available for sale a large quantity of edible dried peas. Although in the contracts with plaintiff, defendant contracted as a seller, it was actually a selling agent for a cooperative association, the members of which were pea growers in a considerable area of eastern Washington and northern Idaho. The peas were stored in bulk, as they were brought in from harvesting, for the most part in elevators owned or rented by the cooperative. Before delivery of peas which had been sold as of any particular grade, it was necessary that they be "processed" to clean and segregate peas of the desired grade.

The total crop grown in the United States in 1947 exceeded 650,000,000 pounds.

For domestic consumption only about 100,000,000 were required. Most of the excess over the domestic consumption volume was ultimately purchased by the United States Army or Department of Agriculture for export. The extent of purchases by the Army or by the Department of Agriculture and the price they paid from time to time, had a highly significant effect upon the price realizable for substantial quantities of peas (one million pounds or more). For example, in the fall and early winter of 1947, the Army or the Department purchased large quantities, and the price rose from under six to over eight dollars per hundred pounds. From late January until May, only one purchase was

made by either the Army or the Department in substantial quantity. The price in actual sales declined, and there was relatively little activity in marketing peas. Most of the price quotations referred to in the evidence either were based on dealings in small quantities or were guesses of what would be paid if large quantities were sold.

The plaintiff buyer and defendant seller were brought together by a broker. They entered into separate contracts, each relating to quantities of either one or two million pounds of peas. The price per hundredweight was not the same in each contract, but was one of the three amounts: $5.85, $6.00, or $6.15. At the trial and in the first briefs, the parties were in dispute with respect to the precise language of the terms of the contracts between them. Plaintiff urged that certain "Confirmations of Sale" signed by defendant's Sales Manager embodied the terms. Defendant insisted that the terms were those set forth in "confirmations" prepared on forms of the brokerage firm which initiated the dealings between the parties. From a later brief on behalf of plaintiff, I understand that plaintiff no longer asserts that the differences in the two sets of confirmations are important for the purpose of this case.[1] I agree with this position and, accordingly, shall discuss only the brokerage confirmations. The following excerpts from one of them may be taken as typical of the terms of each contract (bearing in mind the quantity and price differences indicated above, and the additional difference that in one of the six confirmations the shipment period is "December-January" instead of "January, February, March"):

| | |
|---|---|
| "Article | Alaska Peas US Ones. |
| Quantity | 1,000,000 lbs. |
| Shipment | January, February, March, buyer's call. Buyer to notify seller in sufficient time to make shipment. |

1. In a "Supplement to Plaintiff's Reply Brief" it is said: "* * * We have already conceeded (Plaintiff's Reply Brief, pp. 2 et seq.) that it makes no difference which confirmation is accepted as representing the contract between the parties. We must recognize that we have always entertained some doubt as to what assent was given by the plaintiff to the confirmation sent out by the defendant.

(Plaintiff's Exhibits 2-5A), particularly since, as the defendant has pointed out, plaintiff has by its conduct evidenced that it recognized the Wood-Baxter forms as the contracts, rather than the forms mailed to it by defendant."   f

| | |
|---|---|
| Weights | Packed 100s 10 oz. |
| Price | $6.15 f.o.b. cars shipping point. |
| Payment | Arrival draft against documents. |
| Remarks | Seller to allow W. B. & Co. 10c per 100 commission." |

Toward the end of December 1947, plaintiff notified defendant to ship two million pounds "to the Army at Seattle" during January 1948. Later, definite shipping instructions were sent, and defendant processed, bagged and shipped the quantity as directed. The instructions included special marking of bags, billing, etc., required for shipments to the Army. Defendant received no notification for any further shipments until March 6, when plaintiff requested one million pounds (later changed to 1,480,000 pounds) to be shipped to the Army. Final shipping instructions for these were furnished defendant on March 22. Meanwhile, on March 18 plaintiff's president, Dyke Cullum, called at defendant's office and discussed with Wayne J. Chastain, Assistant Sales Manager, the remaining quantity of peas (3,520,000 pounds) for which no shipment had been ordered. Mr. Cullum requested an extension of time for shipment to include April. Mr. Chastain replied that he was not authorized to grant such an extension. He arranged for defendant's Sales Manager to be available so Mr. Cullum might discuss the matter with him. Mr. Cullum did discuss the subject with the Sales Manager, Frank G. Hough, on March 22, and requested that the contracts be extended through April. Mr. Hough told Mr. Cullum that defendant had for a long time held itself in readiness to make delivery of the quantity of peas called for under the contracts. Further, in effect, that defendant was not agreeable to extending the time under the contracts for the shipment of the 3,520,000 pounds beyond March 31; but that if Mr. Cullum would give defendant shipping instructions at that time, defendant would ship what it could to the extent of its capacity up to and through March 31. Neither Mr. Cullum nor anyone on plaintiff's behalf gave defendant on that day any shipping instructions or notification to ship or deliver any of the 3,520,000 pounds.

Mr. Cullum consulted an attorney and they together prepared a letter to defendant, dated March 24 and received by defendant on the following day. Referring to the March 22 discussion, the letter states, among other things:

"\* \* \* Mr. Cullum, without being required to do so by contracts and without waiving his rights thereunder, made you three alternative offers as follows:

"1. Offer that American Fruit Growers may extend the delivery date, for the balance of three million five hundred twenty thousand (3,520,000) pounds, thirty (30) days through the month of April, or

"2. Offer of payment to you for the three million five hundred twenty thousand (3,520,000) pounds balance upon delivery of warehouse receipts for said balance not later than March 31, 1948, or

"3. Offer of issuance of shipping instructions before March 31, 1948 for the balance of three million five hundred twenty thousand (3,520,000) pounds, for shipment as soon as possible after completion of shipment of the one million four hundred eighty thousand (1,480,000) pounds, giving American Fruit Growers sufficient time to complete shipment.

"In response, you refused each of these offers.

"If your refusals stand, it is clear that you will have repudiated the contracts as regards the balance of three million five hundred twenty thousand (3,520,000) pounds and that you will be liable for all of the damages suffered by the National Commodity Corporation. As you are undoubtedly aware, those damages would be very substantial.

"At the request of Mr. Cullum, and on his behalf, I hereby advise you that if you do not promptly change your position and by letter addressed to me either accept one of the three alternative offers for taking up the balance of three million five hundred twenty thousand (3,520,000) pounds, or make some satisfactory counterproposal which will be in compliance with the contracts, then National Commodity Corporation will hold you liable for all damages resulting from your repudiation of the contracts. And in the event you do not change your position, National Commodity Corporation will take proceedings to collect damages in full.

"If I do not have by the close of business on Saturday noon, March 27, 1948 your written reply to this letter either accepting one of said three alternative proposals, or making such a counter-

proposal, regarding the three million five hundred twenty thousand (3,520,000) pound balance covered by the contracts, then your failure to accept will be deemed repudiation by American Fruit Growers, Inc. of the contracts as regards said balance."

On March 26, Mr. Cullum telephoned Mr. Chastain and said, in substance, that he was under contract to deliver peas to a Mr. Goble (or a company represented by him) and suggested that Mr. Chastain communicate with Mr. Goble and attempt to work out a satisfactory arrangement for the delivery by defendant of the 3,520,000 pounds directly to Mr. Goble, in satisfaction of the contracts between plaintiff and defendant. Mr. Chastain did communicate with Mr. Goble and they arrived at terms satisfactory to them, subject to the approval of Mr. Cullum. By letter dated March 30, Mr. Chastain proposed on behalf of defendant a modification of the contracts on those terms, which are briefly that the delivery period be extended through April and May; that the buyer give written notice to deliver fifteen days prior to the first shipment; that the rate of delivery should not exceed 150,000 pounds per shipping day; that shipping orders be given to permit delivery at that rate so as to complete all shipments by June 1; that the price be increased to $6.30 per cwt. (instead of the contract prices of $6.15 with respect to three million pounds and $6.00 with respect to 520,000 pounds); that the buyer pay for the entire quantity by April 15. On March 31, Mr. Cullum discussed this proposed modification with Mr. Chastain and other representatives of defendant. Mr. Cullum objected to it, particularly to the maximum delivery rate of 150,000 pounds per day, and declined to approve it. He then suggested that the undelivered quantity of peas be shipped to Spokane, Washington, in plain bags, insisting that he had the right under the contracts to order shipment at any time through March 31. Defendant's representatives did not pursue this suggestion, taking the position that it came too late, in that the contracts authorized directions to ship only if in sufficient time to allow delivery by March 31. Plaintiff then charged defendant with repudiation of the contracts relating to the undelivered quantity, and there were no further negotiations between them.

Let us now turn to a consideration of plaintiff's contention that defendant breached its contracts. First, plaintiff says it was not required to call for shipment, or exercise "buyer's call",

in time for defendant to complete delivery by March 31, as a condition precedent to the recovery of damages for defendant's breach of contract, at least in the absence of tender of the peas by defendant. The contracts contain the following express term: "Shipment January, February, March, buyer's call. Buyer to notify seller in sufficient time to make shipment." It seems to me that this language has a plain and unequivocal meaning, which is that both parties agreed that all of the peas be shipped or delivered during the period of January, February and March; that the defendant (seller) was under no obligation to deliver any peas until the plaintiff (buyer) made a definite call or demand for shipment or delivery; and that no demand for shipment or delivery would obligate defendant to ship or deliver unless made so in advance of the end of March as to allow defendant sufficient time to complete shipment or delivery before the end of that period. (I derive the same meaning from the terms of the confirmations of sale prepared by defendant and referred to earlier in this opinion.) Plaintiff has failed to establish any custom or practice generally, or in this particular industry, which would indicate a different construction of the terms of the contracts or the legal obligations of the parties. I find no considerations favoring a different construction and accordingly construe the delivery terms as stated above.

Plaintiff's next point is that it did, in fact, seasonably demand delivery by defendant in sufficient time for completion by March 31. The suggestion of plaintiff's president during the March 31 telephone conversation that defendant ship the peas to Spokane in plain bags was, of course, not timely. Mr. Cullum referred to the entire quantity of 3,520,000 pounds of peas. It would perhaps do him an injustice to take his suggestion to mean that he demanded shipment of this quantity on that very day. But even if that meaning be assumed, then not only has defendant failed to show that the time was sufficient but, on the contrary, the facts demonstrate that it would have been wholly impracticable to comply with such a demand. This leaves for consideration the conversations of March 18 and March 22 between Mr. Cullum and defendant's representatives, and the letter of March 24 of plaintiff's attorney to defendant. (There is no suggestion by plaintiff that any demand or call whatever was made prior to March 18, with respect to the 3,520,000 pounds.

As previously indicated, I find as a fact that Mr. Cullum

neither demanded shipment or delivery nor did anything else equivalent to a demand for shipment or delivery on March 18 or March 22. In the March 24 letter, three alternative offers, said to have been made on March 22, are set forth. I find as a fact that they do not accurately state the substance of Mr. Cullum's proposals at the March 22 meeting, in that the second offer was not made at that meeting, and, as to the first and third, they could only refer to Mr. Cullum's efforts to extend the delivery period through April. Nevertheless, I shall consider them as offers made by the letter itself.

The first alternative is manifestly not a sufficient demand for shipment or delivery for it merely proposes an extension of the delivery date through the month of April or, in other words, a change in the delivery terms of the then existing contracts. The second alternative is an offer of payment upon delivery of warehouse receipts not later than March 31. Plaintiff has failed to establish that such an offer was a legal equivalent of a demand for shipment. The contracts expressly call for shipment and the price terms were "f.o.b. cars shipping point." Plaintiff was entitled to call for delivery in the manner designated in the contracts or in any legally equivalent manner. Any manner of delivery different from that specified would not be legally equivalent (unless agreed to by defendant) if it would occasion appreciable disadvantage or detriment to the defendant under the circumstances existing. The facts demonstrate that delivery of warehouse receipts would have occasioned substantial detriment to defendant. Plaintiff's "offer" to accept delivery of warehouse receipts must be deemed to mean warehouse receipts for the article which was the subject of the sale; namely, "Alaska Peas US Ones." Defendant did not have on hand 3,520,000 pounds, or any substantial quantity, of segregated peas of this grade. What it did have available was a large quantity of unprocessed, ungraded peas in bulk. Accordingly, defendant was not in a position then to deliver warehouse receipts for the quantity demanded (or any substantial quantity) of the specific subject matter of the contracts of sale. To segregate peas of the grade requested by the contract would have required some time. Plaintiff has not shown that defendant could have processed the quantity of peas demanded between the time of receipt of the letter and the end of the delivery period. Nor has it shown that defendant could have effected storage of the peas (after processing) in a public warehouse with-

out financial detriment. Without mentioning other detriments to defendant, it is enough to say that the offer to accept warehouse receipts did not constitute a demand or an equivalent of a demand for delivery by plaintiff under the contracts.

The third alternative is the "Offer of issuance of shipping instructions before March 31 * * * for shipment as soon as possible after completion of shipment of the one million four hundred eighty thousand (1,480,000) pounds" (for which final shipping instructions were not delivered until March 22.) Notwithstanding that less than half of the seven million pounds of peas contracted for had been delivered, and that only seven days of the ninety-one day delivery period remained when this letter was written, plaintiff gave no shipping instructions whatever with the letter, or after it up to March 31. And this in spite of Mr. Hough's offer on March 22 to process and ship to the maximum of defendant's capacity if plaintiff would only give shipping instructions. The third alternative was palpably not a sufficient demand for shipment under the contracts. Even if it could possibly be so considered, it was not in sufficient time to allow completion of shipment prior to the end of the delivery period, March 31.

After careful consideration of the evidence, I conclude that plaintiff did not perform the condition precedent of the contracts, of making a timely demand for shipment or delivery of 3,520,000 pounds of peas. I find no justification for plaintiff s contention that its performance of this condition was excused or prevented by any failure or refusal to perform on defendant's part, or by any act or conduct of defendant. Plaintiff has not established a cause of action for breach of contract by defendant.

As separate causes of action, plaintiff seeks to recover what it contends were substantial overcharges made by defendant in connection with the delivery of the peas which were shipped pursuant to plaintiff's directions.

■ One item of the alleged overcharge is the sum of $360 which represents a charge of $10 for each railroad car of peas shipped by defendant under the contracts. This charge was for special services of the Defendant which were not agreed to be rendered by Defendant in the contracts. They were occasioned by the fact that plaintiff ordered shipment of the peas to the Army, and this required special billing and the placing of the bills on the cars themselves when loaded. The charge was for extra services and was reasonable in amount. Moreover, it appears that plaintiff agreed to pay this charge. The claim to recover the item so paid is without foundation.

■■ Another item of the alleged overcharge is the amount of certain "intransit credits" which defendant received with respect to cars shipped. The contracts stipulate the price "f.o.b. cars shipping point." Thus, defendant was not obliged to pay the freight charges for shipment of the peas delivered. However, defendant did actually pay for the shipment of the peas to the destination directed by plaintiff and, thereafter, defendant collected from plaintiff a sum in excess of the contract price to reimburse itself. Defendant received from the carrier refunds of the "intransit credits" which I shall now describe. The peas which defendant had available for sale had been grown throughout a considerable area. After being harvested, the peas were shipped in bulk from various assemblage points in the area to storage elevators or warehouses. In the case of each such shipment, defendant (or its undisclosed principal, the cooperative) paid the carriers the freight charge from the place where they were assembled after harvesting to the place where they were stored in bulk. Later, the peas were processed and shipped by defendant to an ultimate destination. In many instances (as here) the freight charge for a shipment of a given quantity of peas from the original assemblage point directly to the ultimate destination was the same as the freight charge for shipment from the storage and processing point to the ultimate destination; in other words, that with respect to

shipments to the ultimate destination, the place of original assemblage and the place of storage were "common rate points". Defendant (or its undisclosed principal) was a registered "in-transit operator", and upon shipment of peas from the storage point, after processing, was privileged to receive credit or a refund of the amount it had paid for freight for the shipment of that quantity of peas from the original assemblage point to the storage point (subject to certain deductions which will be discussed later). Thus, the "in-transit credits" arose out of a previous shipment of peas and entitled the "in-transit operator," in the event of a subsequent shipment of peas after processing, to refunds in the amount of the freight paid for the first shipment (subject to deductions and provided that the "in-transit credits" were applied to second shipments within one year from the first shipment). The receipt by defendant of a refund of "in-transit credits" applied to shipments of peas from defendant's storage points to the destination directed by plaintiff did not increase the freight which plaintiff would have had to pay if the "in-transit credits" had not been so applied. Plaintiff was not entitled under the contracts, or otherwise, to any such refunds.

██ ██ The freight rates applicable in the event "in-transit credits" were applied were those rates in effect when the original shipment was made from the assemblage point to the storage point. It so happened that the freight rates for shipments of peas increased between the time when the peas were shipped from the assemblage points to the storage points and the time of the shipment from the storage points to the ultimate destination. Thus, the freight actually paid by defendant was at the lower rate. Defendant charged and collected from plaintiff an amount for freight based upon the current rates prevailing at the time of shipment to the ultimate destination, thus at the higher rate. Of course, if the "in-transit credits" had not been applied by defendant, the amount which would have had to be paid for the shipment would have been this amount which defendant collected

from plaintiff. But the higher rate was not the basis of computation of the freight actually paid. Having paid the freight, under the circumstances here, defendant was entitled to reimbursement from plaintiff for the freight charge for the shipment from the storage points. But it seems to me plain that this charge should have been based upon the actual rate paid, rather than upon a rate which would have been paid under hypothetical conditions. Accordingly, plaintiff should have had the benefit of the lower freight rate.

Defendant argues that, in any event, in order to obtain the lower rate, it was necessary to apply "in-transit credits"; that plaintiff had no such credits; that defendant's credits actually applied were subject to deductions (alluded to above) of a 3% federal tax, a shrinkage allowance of 1% of the weight of the shipment, and a stop-over charge; and that if plaintiff would benefit from the lower rates, it should accept the burden of these deductions. The argument is not persuasive. The deductions were required in order to obtain the refund privilage of "in-transit credits" without regard to any change in freight rates. It seems more reasonable to treat them as incidents of this privilege, and as chargeable to defendant which received the benefit of the privilege, in the absence of an express agreement concerning the deductions. The sum collected by defendant from plaintiff for freight was excessive in the amount of $771.09 because of the computation of freight at the higher rather than the lower rate; and the excess may be recovered in this action.

Lastly, we come to defendant's counter-claim for damages. Defendant charges that plaintiff's failure to give instructions to ship the 3,520,000 pounds of peas was a breach of plaintiff's contracts, and that plaintiff is liable for resultant damages. Defendant offered evidence that after March 31, 1948, it made diligent efforts to sell this quantity of peas, but was unable to do so until the latter part of May. The price at which it sold them was $6.12 per cwt.

It has been previously mentioned that defendant was a selling agent for an undisclosed principal, the cooperative. On August 2, 1948, the undisclosed principal assigned to defendant all claims for losses of every kind sustained by the undisclosed principal by reason of the failure of plaintiff to take delivery of and pay for the 3,520,000 pounds of peas.

■■ Plaintiff's defense to the counterclaim on the ground that defendant was merely an agent of the undisclosed principal at the time of any breach, and that the undisclosed principal is not joined as a party, is unavailing in view of the assignment to defendant by the undisclosed principal. Plaintiff also urges that defendant cannot recover because it has not alleged or proved that it tendered to plaintiff the undelivered quantity of peas. It does appear that by letter dated January 26, 1948, from defendant to plaintiff, replying to an inquiry concerning the amount of notice of shipment desired to enable completion of shipment of the five million pounds then undelivered, defendant said: "It would be greatly appreciated if you can give us instructions, including bag marking, by return air mail. This will enable us to get the bags printed and work out our mailing schedule." Defendant was ready, willing and able to make delivery at all times during the delivery period of the contract, upon seasonable receipt of directions to ship or deliver, as required by the contracts. The contracts imposed a duty on plaintiff to make a definite call for shipment before defendant was obliged to deliver. Plaintiff failed to perform this duty, and it therefore follows that defendant was under no duty to tender the peas. 2 Restatement of Contracts, § 397; 55 C. J. p. 313, 322, 323; 12 Am. Jur., Contracts, § 333, p. 889. Plaintiff's defenses are without merit, and judgment must be rendered for defendant on the counterclaim.

■ The items of damages claimed are the net difference between the contract price for the 3,520,000 pounds and the resale price of that quantity; interest on the purchase price from April

1, 1948 to the date of collection on resale; storage and insurance charges incurred between April 1 and the date of delivery on resale; costs and expenses of resale; interest at 6% per annum on the total of the foregoing items $8,538.71 from August 20, 1948. These seem proper elements of damages. However, the sum claimed must be reduced by the amount of the overcharges set forth above ($771.09) with interest at 6% per annum from the dates of the overcharges. Defendant may submit a computation of damages under this ruling, upon notice to plaintiff's attorney.

Judgment for defendant will be entered in accordance with